Takeda Pharmaceutical Company v. Twi Pharmaceuticals. This appeal presents essentially four issues. First, whether a 27E2 infringement claim can be made based on a patent that is not listed and submitted to the Secretary and listed in the Orange Book. Two, whether the District Court erred in finding that the 282 patent was invalid because it lacked a written... So, let's go back to that first issue. Certainly. Section 271 uses the word a patent. It doesn't say patent listed in the Orange Book, correct? How do you want us to read that into the statute? Sure, Your Honor. If you look at the entire statute, it says it should be an act of infringement to submit an ANDA, and then if you read at the end, it says if the purpose of the submission is to obtain approval under the act to engage in the commercial manufacture of a product claimed in a patent or the use of which is claimed in a patent before the expiration of such a patent. That whole phrase is used throughout the Hatch-Waxman Act to refer to the patents that are listed in reference to the branded drug for which the patent, the generic, must submit a certification, and the certification says, here we certify we're going to address every single one of those patents that are listed. Why wasn't Congress written in those words, a patent listed in the Orange Book? Well, they did. They said the patent's listed with the Secretary. It's before the expiration of that patent. So, if you look at that section and then you look at the section that corresponds to this, which we referenced, which is what, under the circumstances under which the FDA can approve an application, it says explicitly and spells it out that FDA can only approve an application, has to approve it within a certain period of time unless an action is filed under 271E2 with respect to a patent submitted by the brand company to the Secretary. And so, there is a balance between that. If you read it the way Your Honor suggests, which I think that is Takeda's position, that means any patent, then you would be, I think, all the case law where we've discussed these issues over the years would have all been for naught because it would have been very simple and in the Momenta case, which I believe Judge Moore wrote... You would argue that all jurisdiction under 271 requires an Orange Book listing? I'm requiring that under 27E2, in order to have jurisdiction or to state a claim under 27E2, the patent that's asserted must be listed in the Orange Book. That's exactly what Judge Moore wrote in the AstraZeneca versus Apotex case. I'm not, maybe it wasn't Judge Moore, but you're on the panel, where they said jurisdiction is... The only thing required to allege jurisdiction under 27E2 is that the ANDA infringes a listed patent. Can you move on to your anticipation argument and explain why Larson is in fact enabled? Why is Larson... Well, what we say, Your Honor, is there's Larson and Barberich. Barberich incorporates the Larson information and then it says explicitly that you have a powder, that the dexlansoprazole is in a flowable powder, preferred, and it was admitted that if it was enabled to make a flowable powder, that powder would in fact be amorphous and therefore it would be invalidated. That was never disputed by the plaintiffs in this case because they were arguing... The argument that was held was that it wasn't enabled and he rejected Dr. Elder's testimony on that point. I'm asking you to tell me why that's wrong. It's wrong for, I think, three reasons, Your Honor. First reason was it was wrong because the district court put the burden on the TWI to prove non-enablement of the prior art, of Larson and of Barberich. Larson claimed, had a specific claim for pharmaceutical salts of dexlansoprazole. So, under the Antwerp media case and the case cited in our brief, this court has stated that actually someone challenging enablement of any patent is the one who bears the burden to prove it. It makes no sense for the patentee here to say everybody's patent or my patent is entitled to the presumption of validity but nobody else's is. The patent office granted Larson, it reviewed the Barberich application, and Larson explicitly got a claim entered with dexlansoprazole and pharmaceutically acceptable salts of dexlansoprazole in a claim. So the burden was on them. Second, the district court made a fundamental error with respect to Larson. He got caught up on whether or not you could replicate Larson perfectly to end up with an oil. When Larson, the chemical reactions that were described in Larson were replicated by Dr. Elder and he mixed the exact same amounts of the materials, exact same way, ended up with dexlansoprazole and then he just dried it, it came out. So his theory, his explanation was that from all the evidence that what you had in Larson was pure dexlansoprazole with some residual solvent. Their expert came in and said, wait a minute, we think that what you have here in Larson is some mystery meat that is pure dexlansoprazole but magically it's an oil. And when Dr. Atwood was cornered on this during his cross-examination, we asked him, do you have any support for your theory that something can exist in nature simultaneously in pure dexlansoprazole at room temperature as a solid and as an oil? And he said no. And that flew right over the district court's head, didn't address it in his opinion. And it is an instance where the district court, factual findings, because they didn't appreciate the admission, it's totally erroneous. Unfortunately, I may not totally appreciate it either. So you might want to go back over it since you obviously think it's really important. But before you do that, I guess my question is, Dr. Elder was supposedly attempting to follow the Larson process, which should have resulted in him getting an oil. That's what Larson disclosed. He followed the Larson process and got a solid. So that left the district court sort of scratching its head a little bit. And I don't even think Dr. Elder explained why he got a solid. I think he was sort of surprised to have gotten a solid and not need to... What Dr. Elder said was, and what the evidence was, is that when I replicated this, I followed those steps and I got what I got, since I got a solid, and because dexlansoprazole is a solid at room temperature in dexlansoprazole, I got dexlansoprazole with some residual solvent. So if the issue was only removing residual solvent from dexlansoprazole, if that's what you had, then it would be a matter of course for anybody to remove additional solvent. And that's where the theories offered by Professor Atwood, he said, okay, I've looked at all the information, I'm concluding that Larson had this mystery meat of dexlansoprazole oil, okay, and that you couldn't do anything with it. And we asked him what your support for that was and he had none. He said, I can't support that in light of all the facts. Dr. Elder said, and Dr. Rogers said, and even their own expert, Dr. Meyerson, who they offered during the earlier proceedings on summary judgment, said that Larson is just pure dexlansoprazole with some residual solvent. And then the third reason why the district court erred in not finding anticipation was that the district court didn't even address whether you could make things directly from Larson's oil. And the evidence is uncontroverted that you could make the salts that are claimed from Larson's oil, it's pure dexlansoprazole, the first step in a salt reaction is to dissolve the material and you could perform the salt and that the disclosures in Barberidge with respect to salts were identical to the disclosures in the 282 patent with respect to salts. Well, what about the district court's conclusion about solvents? He said that once Gildner and Larson would have had prior publications that taught appropriate solvents for extraction and flash chromatography, that Dr. Elder didn't use any of the solvents disclosed in the prior art, he chose completely different solvents and gradients for those solvents and used them in Larson's method. Well, I think that the evidence… How do we know in short that the ones that Dr. Elder chose were known in the prior art such that one of Skill in the Art at the relevant time would have used those solvents to arrive at the… Well, I believe that their expert testified that the choices that Dr. Elder used were available to persons of Skill in the Art. And so these steps that you're describing are steps that are not specified in Larson and Dr. Atwood even admitted that he did not specify these steps, the ways to perform these steps in his own patents. And so you have a situation where the person of Skill in the Art can gap fill on routine things. Larson didn't think these procedures, how you extract and do these removals and purification steps were at all pertinent. I don't remember what precisely did Dr. Atwood say about this because it's my recollection that he said something like, yes, these solvents were known, but what he didn't say is one of Skill in the Art would have chosen these. I mean, this is a very unpredictable field. It's not something I feel like I know a lot about, that's for sure. Very unpredictable field. So the fact that there are, I mean, there are millions of possible solvents out there. You know, the fact that this would happen to exist among millions is not the same thing as establishing that one of Skill in the Art at the relevant time would have used it in this process. Well, Your Honor, I think that if that's, here there are, the Larson reference discloses from a very experienced people's patent and they disclose a whole series of chemical reactions performed to obtain different chemicals, okay? And they don't disclose specifically what they use for any of these things in the context of this patent. And everyone understands that, you know, things that are routine or can be gap filled are okay to leave out of patents. So that doesn't make Larson not enabled. But only if Dr. Elder, in producing Larson, since the question is enablement, only if what Dr. Elder did is what one of Skill in the Art at that time would have done. Dr. Elder's proof that he established Larson on the second try is meaningful, but only if he established it by Well, Your Honor, I think the steps that have been, you know, Dr. Ed would just, you know, basically, I think, nitpick at what Dr. Elder did. And no one ever said that anything was significant or would lead, he would just say this was different, this was different. He didn't say that the different choices would have infected the experiment in any way. He just was arguing that they were differences. And without saying that there was any consequence to any of those differences. And all the evidence is that there was no consequence to any of those, because nobody puts those in any patent. You said, you started by saying there are four things on appeal. You've got two minutes left and we only covered two. Do you want to take a quick minute to say something else about one of your other points? Sure, Your Honor. With respect to the claim construction of amorphous that the district court adopted, I think it's important to recognize that we said, you know, there was no discussion in the patent of amorphous at all. It's amorphous compound and the district court read in a solid limitation. We were recently instructed that we need to give deference to expert testimony in claim construction. And we actually have some of that here. The district court did in fact rely on an expert with regard to what amorphous meant to people in this particular industry. So what do we do with that? Well, I think, Your Honor, the factual conclusions of the district court based upon the evidence are what leads you to reject what he did. He said it's undisputed that the patent makes no mention of amorphous. He said it's undisputed that the term, at page 222, he said the term amorphous compound is not used in the specification, much less defined. At 230, he said the district court found that there are two possible meanings of the term. Quote, there are two possible meanings of the term, both of which might be characterized as plain and ordinary meaning of the claim term. That should have ended the inquiry under this court's reasoning in Thorner, Judge Schall's opinions in Brookhill or Texas Digital, and even Judge Reyna's decision in area. And then he said he relied on, the other fact finding he made was that the amorphous compound that is in examples one and two was a solid. That's all that appears. Otherwise, the application is devoid of any information about this, and he read those were not disturbed, that it was improper when the court found that there were two meanings, both of which were consistent with the use in the specification. He was required to adopt something that encompassed both of them. He did not. I think we need to give the other side a chance. Mr. Dane. Let me please the court. I'll begin with addressing the jurisdictional issue briefly. I think the court is absolutely correct that what TWI is arguing for is a reading of 271E2A that would add language that Congress did not include. The language of that provision states, it shall be an act of infringement to submit an application under Section 505J of the Federal Food, Drug, and Cosmetic Act for a drug claimed in a patent. And they stop there. If the purpose of such submission is to obtain approval under such act to engage in the commercial manufacturer use or sale of a drug claimed in a patent before the expiration of such patent. That is exactly the situation here. TWI is seeking approval from the FDA to sell a drug that is claimed in a patent. And the main reliance that TWI has relied on for their view that there is no jurisdiction is the Warner-Lambert decision of this court, which is very different because that is a decision that relates to method of use patents. And it's somewhat coincidental, I guess, that we had a previous argument that talked about the difference between the Article B and the Article A. In the Warner-Lambert decision, the court very carefully construed the statutory language. And one of the basis for its decision was when Congress talked about use patents. It used the word the. It said it shall be an act of infringement to submit an application for a drug claimed in a patent, the use of which is claimed in a patent. Time is fleeting, counsel, so can you move to the anticipation argument? Absolutely, Your Honor. First of all, with regard to the counsel said that the court partly erred in placing the burden upon them to disprove enablement of barbarage. The court actually expressly said that it didn't matter where it placed the presumption here because this wasn't a case where the evidence was essentially an equipoise. The court found that Takeda had produced sufficient evidence to convince it that barbarage was not enabled. And even in the Amgen III case, this court recognized… Why? Dr. Elder was able to produce the composition on his first time you drove? I mean, two tries doesn't seem like undue experimentation to me. So why is it such that that is not clearly erroneous? Well, Your Honor, I think here we have to look at… It's an unusual type of anticipation argument because we start with barbarage. Barbarage has no teaching as how to make dexamethasone resolve. Barbarage is basically a solid form of dexamethasone resolve. So this is how you get an oil. And so what Dr. Elder was initially attempting to do was to faithfully replicate Larson and then prove their theory was that we can get that oil, we can dry it. That was Larson's problem. He didn't dry it enough. And if we dry it enough, we'll wind up with a reenactment of the experiment. They didn't even get the compound. They didn't even get dexamethasone resolve. They got the racemic mixture. So they never even tested it for chemical purity. They never attempted to isolate it. They acknowledged that they couldn't have been able to. They wouldn't have been able to tell if the state of matter was… We all know. First try didn't work. Second try. So the second try, instead of trying to replicate the example again, the experiment again, they changed. How did they change? Well, the most significant change that they made, there were several changes that they made… Do you think the drop-wise is the problem? Yes. But the problem is Larson doesn't say, for this example, Larson doesn't say do it drop-wise or do it all at once. First time he did it all at once. Second time he did it drop-wise. Larson, it's not that they deviated from Larson, because on this point, Larson doesn't tell you which way to do it. Right? Am I misreading something in Larson? Larson does not have an explicit instruction? To do it either way. And this district court made fact findings that drop-wise introduction was known and regularly used in the art, in this field, or in this exact purpose. So, given that fact finding, why wasn't it an error of him to then say, to the extent that Dr. Elder did it drop-wise, that's a problem? Precisely because of what Larson's basic teaching is. Larson was coming up with a new synthetic method to make these enantiomeric compounds. And he reports in his patent that the old way of doing it was to do it at extremely low temperatures, negative 20, negative 40 degrees centigrade. The reason was other methods of making these enantiomers were incredibly heat sensitive. And Dr. Elder said, and this is not disputed, I don't think, that there are two ways that he could have modified his first test. Number one, he could have done it drop-wise, or number two, he could have lowered the temperature. But because Larson has expressed that it's not going to be the low temperature variety, he did it drop-wise instead. So why, I don't understand, why is that a problem? Because he's still violating Larson's teaching. How? Because the only reason that you would slowly add the oxidant is to control the temperature. And that's in the record, there's no dispute. The only reason you do it is because you understand it to be a heat sensitive reaction, and if you add the oxidant all at once, it's an exothermic reaction, it gives off heat, it might heat things up and that can interfere with the synthesis. The very teaching of Larson is that that is not true of his methods. No, because this example doesn't describe whether it's all at once or drop-wise, and in other places in the Larson patent it does actually disclose drop-wise and or all at once, but not on this example, it doesn't disclose it. It only says don't reduce the temperature, don't do the low temperature variety. I don't understand why that would exclude somebody from entering it drop-wise, which might give you the same result, but without manually lowering the temperature. Well, Your Honor, first of all, that's inconsistent with Dr. Elder's own admission. He said he was trying to do what his reading was of Larson the first time, and that was adding it all at once. So it's consistent with how he read Larson and with how our experts said one would normally read Larson. I believe that it's unequivocal that Larson doesn't say do it all at once. Am I right? With this example, is there anything that says do it all at once or do it drop-wise? Are there other examples in Larson which do specify one or the other? There are others, but also it's important to keep in mind the amount that we're talking about here. It's a teaspoon. It is a tiny, tiny amount, and he took, I think in the record it was found it was an hour, an hour and a half. No, it was 30 minutes or it was 60 minutes. I'm sorry, 60 minutes. And the district court was not clear about which one it was, but he said it didn't matter in the end. Yeah, there was a notation in his notebook that said it was 60 minutes, and the court credited that. But it would not be the natural thing to do when you've just got a teaspoon, a tiny amount to add, to add it in this very extracted way. But that's completely contrary to what the district court expressly found, which is drop-wise additions of these exact sorts of materials were well-known in the prior art as a method to use. I mean, it's not always the case that you're dumping a ton of it in. Lots of instances you are using a tiny amount, and that drop-wise was a regular prior art existing method of doing this. But what the court said is it was a known prior art method for controlling the temperature. That's the only reason that you do it that way. It is absolutely the only reason, is that when you add it quickly, because it's an exothermic reaction, like putting something volatile into a liquid, all of a sudden it can heat it up, it can boil. The problem is that used to, in other techniques, it used to affect the synthesis. And Larson's express teaching is temperature does not affect my methods. It's an advantage of my methods. And we're not even talking about a modest change in temperature. He went from negative 20 to negative 40 degrees in the prior art. He said you can do this at room temperature. The message there to someone of skill in the art is don't worry about temperature. You do not need to care about it. So it is not a routine... So Larson said you can do it at room temperature. Did Dr. Elder do his experiment at room temperature? He did. He did. So how is entering it drop-wise somehow contradicting the teaching of Larson to do it at room temperature? Your Honor, because if there is a heat-sensitive reaction, and people have two ways to address the heat sensitivity. One of them is you do the reaction at a very, very cooled temperature. The other is you, together with that, or separately, you add the oxidant extremely slowly. And you have Larson telling you, don't worry about that. Don't worry about the heat sensitivity. This can be done at room temperature and it's not going to matter. Then one of skill in the art, back at that time... Does Larson actually say what you just said it is, which is don't worry about the heat sensitivity, or did he just say that this can be done at room temperature? He says it can be done at room temperature. So it doesn't say don't worry about the heat sensitivity. It just says it can be done at room temperature. No. Is there anything else that you wanted to... other than drop-wise, are there other points that you wanted to make? Well, in addition... What's the motivation that Larson would provide to do the synthesis drop-wise? I think he teaches away from doing it drop-wise, Your Honor, in this instance. Does it matter in this situation that Dr. Larson was of extraordinary skill? Yes, I think that... Dr. Elder, I'm sorry.  Dr. Elder. Well, I think that's also a problem here, Your Honors, is that... Look, we have Larson, who's wanting to make compounds for pharmaceutical uses. He'd like to come up with crystals, not only solids, but he'd like to come up with crystals. Sometimes he's successful in doing that. Sometimes he comes up with a non-crystalline solid. Other times he just winds up with an oil. So he doesn't, with dexamethasone, he doesn't achieve an oil. So that's one data point. This is the reality of what someone of high skill in the art was able to do. Then we have Dr. Elder come along. And this is 16 years later from the time of the 2A2 patent filing. And he's initially trying to do what Larson did to get what Larson got. And he can't do it. He doesn't get it. And so then he changes from that and he modifies various parameters. In addition, there's the drop-wise change. He does select particular solvents. And this is someone sort of with a target. He's not trying to get what Larson got. He's trying to get something different 16 years later in litigation and then make the argument that 16 years earlier, this is what somebody of skill would have done. And I think that's a very dubious proposition for his choices that he's making, what he's doing with the solvents. He had relied upon literature. He said he was relying on literature at the time that told him these are the types of solvents you can use here. He didn't use those. He picked other ones. Now, it's true that picking solvents is something that chemists do. But he didn't pick the ones that were in the art that would be the natural ones that one of skill would use. He didn't test chemical purity of what he got. So we don't know exactly what it is that he got. He did the purification techniques over and over and over again. This is, in the context of litigation, this is someone who is, again, has a bull's eye of this is where I want to be, supposedly to show that this is what somebody would have done 16 years earlier. And he wasn't successful the first time. He changed parameters the second time. He changed what he did. And we think the court properly found that those changes were not what would be deemed routine experimentation. And I would note that with regard to GW, this court has recognized or the predecessor court, the Court of Custom and Patent Appeals, previously recognized that when somebody tries to replicate a prior art experiment, they may have to modify some of the parameters. But the important distinction there is they're trying to get what the person who did the previous experiment got. Here, they're trying to get something different. And an argument that Barberidge anticipates solid dexamethasol. When Barberidge doesn't tell you how to do it, it refers to Larson, and Larson doesn't tell you how to do it, but that litigation experts 16 years later can fiddle around and they can come up with a solid and then say that, therefore, Barberidge anticipates solid dexamethasol. We believe the court properly rejected that conclusion. I'm almost out of my time, so just very briefly on the cross appeal. I would say that in our view, the court, with regard to the release terms, took an unduly restrictive view of those terms. The court recognized in its original summary judgment hearing that this notion that release is sort of a, I think of it as a digital binary type thing where you can pick a pH level and there's no release at, say, 4.9, and then suddenly there's release at 5.0. That's not science. It's more of an analog function. You have a continuum of the amount of release, and this is recognized in the USP guidelines for testing delayed release products. We think the court, I seem out of my time, I see that the USP standards for delayed release products provide industry-wide guidelines that everybody knows that would have been known to one's skill in the art that are objective and that tell you how to determine what amount of unwanted release is unacceptable. And that's an unusual situation because you're normally not dealing with that. When you're dealing with it, we want to see how much release we want to get. And those guidelines, in our view, properly should have been considered in determining the amount of release that the claims are talking about when they talk about this range of release of no less than 5.0 to no more than 6.0. Okay. Thank you, Mr. Dain. Mr. Misurk, why don't we give you two minutes of rebuttal time and we'll give Mr. Dain an extra minute of rebuttal only on his cross-appeal if he needs it. Thank you, Your Honor. Let's go back to the claim language on the 755 patent. Such that the active ingredient is released in the pH range of no less than 5.0 and no more than 6.0. That is the claim language. And it is undisputed that in all tests, the TWI product releases active ingredient below pH 5.0. Therefore, the District Court's summary judgment of no literal infringement was appropriate. Did you say at all times it releases below 5.0? So immediately at what, 4, 3.5? What does the test show? I think the test that we had in the record that the plaintiffs put in were at pHs of 4.5, 4.7, 4.9. For how long? For whatever duration. But, I mean, it's different as you approached at 4.9, which is what the plaintiffs offered, they had tests that released, we had tests that released this... The claim doesn't include a time, right? The claim does not include a time. So in every single one of these tests that are below pH 5.0, there is release. Sometimes it takes a little bit longer, sometimes it doesn't. But it releases, it's not de minimis, and it goes off like a plane taking off. And the time of the worst test, the one they relied on, is still a much shorter duration than the only dissolution data that was ever submitted in the context of the case during the Kurosawa Declaration, where they were illustrating what it was like for something to release at pH 6.8. They ran the test, and at 6.8, there was no release until over three hours. And they said that still demonstrated release at 6.8. So only by adding an arbitrary cutoff of time or amount do you then change the data, or begins, to something else. And so now they're not arguing begins anymore, they're arguing somewhere in the middle. Not begins to release, not all release, but somewhere in the middle. And then, as we've made clear, that if you start fudging with this, then the claim term is indefinite. And I think one of Judge Marina's cases, even after Nautilus, said that's a problem then. Because if you look at page, for example, on page A6988 of the record, we have a list of all the different tests that were performed, and whether or not the Dexland or the TWI product will meet the limitations, depending upon what tests you have. If the test then becomes critical, and under Honeywell and other cases, then you have to say that there's no guidance and it's indefinite because nobody knows what the heck to do. The patentee couldn't figure out what to do. They had to run all sorts of tests on our product, which we got, and they tried to hide from us. And we found out how they actually came up with 10% two hours. It was that they tried to manipulate the test as best they could to get the best result, and even the best result they can got it to us. Okay, thank you. Mr. Dane, you have two minutes of rebuttal time, please. Thank you, Your Honor. As I said before, it blinks scientific reality to have this idea that you can have a particular pH level above which there will be release, below which there will be zero measurable release over any infinite amount of time. That is where the court ultimately came out in this claim construction, so that you could show 1% release over 15 hours at 4.9, then that removed something from the scope of the claims. And we've submitted in the appellate record examples to show that this isn't how it works with polymeric coatings. A5786 and A5791 show data for release at the pHs of 4.7 and 4.9, and for any release that is 10% at one particular pH, if you go 0.1 pH level below that, you're going to see some release. And Takeda's data at 150 minutes, TWI's data at 240 minutes reflects that. Similarly, at pages 8, 5, 7, 9, 6, and 5, 8, 0, 1, with releases at pH 5.7 and 5.9, show this same phenomenon for Takeda's release at 120 minutes and TWI's at 150 minutes. This is the reality of how these work, and there is a commonly understood understanding in the industry of what is the release that's not considered to be real release. The Becker patent even makes reference to the fact that here we want no release, and what it's talking about is less than 5% release or 10% release at a particular pH. That's where the USP dissolution standards come in. They tell you if it's 10% or less in two hours, that really doesn't count. It's de minimis, and you don't consider that to be release. Thank you. Thank you, Mr. Bain. Case is taken under submission. I thank both counsel for their arguments.